## No. 2013
### Second Circuit Appeal

---

**GOODE-CAGE DRUG COMPANY, INC., v NATIONAL CIGAR STORE, ET AL.**

**CAMPBELL ICE CREAM FACTORY, LTD., v. NATIONAL CIGAR STORE, ET AL. (CONSOLIDATED)**

---

(March 17, 1925, Opinion and Decree)

---

*(Syllabus by the Editor.)*

1. **Louisiana Digest—New Trial—Par. 3.**

An application for a new trial is addressed to the sound discretion of the lower court and when granted is rarely if ever disturbed by the Appellate Court for the reason that the trial court may, in its discretion, grant a new trial ex officio.

2. **Louisiana Digest—Sales—Par. 160.**

Where the evidence shows that the defendant bought and received the goods while operating the National Cigar Store, that he sold the same or a greater part of them and received the money for same, he is liable for the purchase price.

Appeal from the Second Judicial District Court of Louisiana, Parish of Webster. Hon. Robert Roberts, Jr., Judge.

These are consolidated cases against the National Cigar Store and Charles Dickens on open account.

There was judgment for plaintiff and defendant, Charles Dickens, appealed.

Judgment affirmed.

Drew & Drew, of Minden, attorneys for plaintiff, appellee.

Lee & Lindsey, of Minden, attorneys for defendant, appellant.

REYNOLDS, J. These cases presenting similar issues were consolidated and tried as one in the court below by agreement of parties.

In each the plaintiff filed suit against National Cigar Store and Charles Dickens on open account.

There were two trials. On the first there was judgment in each case rejecting the plaintiff's demand.

The plaintiff in each case applied for a new trial and it was granted.

On the second trial judgment was rendered in favor of plaintiff, Goode-Cage Drug Company, Inc., and against defendants, National Cigar Store and Charles Dickens in solido for the sum of $231.01 with legal interest from judicial demand; and in favor of plaintiff, Campbell Ice Cream Factory, Ltd., and against defendants, National Cigar Store and Charles Dickens, in solido, for the sum of $383.50 with legal interest from judicial demand, and maintaining and perpetuating writs of attachment and garnishment sued out by plaintiff in this last named case.

The defendant, Charles Dickens, has appealed.

The defendant, Charles Dickens, now urges with great force that the new trial should not have been granted.

An application for a new trial is addressed to the sound discretion of the lower court and when granted is rarely if ever disturbed by the appellate court, for the reason that the trial court may, in

its discretion, grant a new trial **ex officio**.

Code of Practice, 547.

Gale vs. Kemper, 10 La. 205.

Muller vs. Hoth, 105 La. 246, 29 South. 709.

### OPINION

The plaintiff in each of these cases sued on an open account, the correctness of each of which is fully established by the evidence; but defendant, Charles Dickens, denies liability on the ground that the business belonged not to him but to one A. B. Moreland.

The evidence shows that in December, 1921, or January, 1922, A. B. Moreland and Charles Dickens discussed a trade by which Moreland was to sell Dickens the National Cigar Store.

As to this proposed sale, Mr. Moreland testified, page 14:

"Q. Mr. Moreland, just state to the court in your own language what took place between you and Mr. Dickens when this property was sold to Mr. Dickens—if it was sold to Mr. Dickens?

"A. You mean from the first?

"Q. State the whole transaction.

"A. From the first—the connection that we had together all through?

"Q. Just state the whole thing for the court's benefit.

"A. Well, at the time that I was figuring on making this move to the new store I was talking with Mr. Dickens in regard to the—he wanted to buy the business at this store down here which is known as the National Cigar Store. We talked the matter over and we decided just that he would take the store and run it on a half interest basis.

"Q. When was that?

"A. 1921.

"Q. All right.

"A. You see, I moved away from there in April, 1921, to the new store that I now occupy.

"Q. Go ahead.

"A. We came to an agreement that he was to continue the store there and run the store and buy a half interest. The business ran from that year until 1922. Before the beginning of January, 1922, he came to me and wanted to buy the business over. Buy the business complete, as he preferred to run it that way—on his own hook. I told him that was satisfactory as I had as much as I could look after at my new store and for him to go ahead and take the business.

"Q. Did you make him a price?

"A. I did not at that time. We talked it over and discussed the price and the price that was first mentioned was satisfactory—it ran into January and I told him that we would make this inventory and then agree on the price. So the first of January I turned the business over to him and the inventory was made and after the inventory was made we agreed on a price which was satisfactory.

"Q. What was the price?

"A. The consideration was three thousand ($3000.00) dollars.

"Q. He accepted that?

"A. He accepted that and that was all that was said, and he went ahead with the business and then he began buying and signing the checks—buying on his own account. Prior to that time I was supplying drugs and sundries and things for the store, as he could get his supplies from up there; that was during 1921.

"Q. Right there—you stated that you made a deal for a certain price?

"A. Yes, sir.

"Q. He accepted the price?

"A. Yes, sir.

"Q. And you delivered the goods to him?

"A. Yes, sir, they were.

"Q. Turned over to him?

"A. Yes, sir, and I walked out.

"Q. Did you have anything to do with the management or running of the National Cigar Store during the year 1922?

"A. None whatever; dictated nothing.

"Q. Have you derived one penny from the National Cigar Store during 1922?

"A. I have not.

"Q. Have you handled the money?

"A. I have not.

"Q. Did you buy the goods?

"A. I did not because I notified these people that I was connected with it no longer.

"Q. That you had nothing to do with it?

"A. Nothing to do with it."

From the time Mr. Moreland walked out and left the business with Mr. Charles Dickens, thinking, as he states, that he had sold the business to him, the business was conducted by Mr. Charles Dickens.

Mr. Dickens, on page 13, says:

"Q. Mr. Dickens, you are one of the defendants in this suit?
"A. I am.

"Q. The Goode-Cage Drug Company, Incorporated, filed suit here for a debt of two hundred and thirty-one dollars and one cent ($231.01). Is that correct Mr. Dickens?
"A. I think it is, as well as I remember.

"Q. The Campbell Ice Cream Factory of Shreveport filed suit for the sum of three hundred and eighty-three dollars and fifty cents ($383.50). Is that account correct?
"A. As far as I know, yes, sir.

*   *   *   *

"Q. You bought the goods?
"A. I bought part of them mostly from the Goode-Cage Drug Company—from Mr. Skoog.

"Q. You paid for some of these goods?
"A. Yes, sir.

"Q. How were the checks written?
"A. National Cigar Store per Charles Dickens.

"Q. You handled all of the cash in this business?
"A. Yes, sir, I did.

"Q. Where did you deposit the money?
"A. Webster Bank.

"Q. Under what name was the money deposited?
"A. National Cigar Store.

"Q. You were the only party checking against this account?
"A. Yes, sir.

"Q. You had absolute charge of the National Cigar Store?
"A. Yes, sir.

"Q. There was no interference with your management down there?

"A. No, sir, nothing at all.

Page 39

"Q. You got all of the money that went in there; you handled all of the money?
"A. Yes, sir; handled all of the money.

*   *   *   *

"Q. Who paid the money for the rent the first six (6) months?
"A. I did.

Page 42

"Q. How much were you willing to pay for the business?
"A. I was willing to pay just his proposition; just as he came down and told me.
"Q. Three thousand ($3000.00) dollars?
"A. I would have, yes, sir.

Page 37

"Q. Well now, at the first of the year 1922, what kind of a price did he make you?
"A. He made me a proposition that I would take it for three thousand ($3000.00) dollars."

On page 29, Mr. Ed. Botton testified:

"Q. He continued to pay you in that same way—did he, or not? Did he ever give you a personal check?
"A. When the business changed hands —when he bought the business over all of the checks was signed Charles Dickens.

*   *   *   *

"Q. When did that change come about?
"A. Some time about January, 1922.

On Page 30

"Q. What did Mr. Dickens tell you, Mr. Botton?
"A. When I went to work there he told me that Mr. Moreland was interested in the business—owned part of the business.
"Q. Yes.
"A. It went on that way until about January—some time in January or the first of February when Mr. Moreland came down there one day and they made the trade. It was my understanding that he said he had bought it. He said that he was

going to run it different from what he had been running it.

"Q. Mr. Dickens told you that he had bought it?

"A. Yes, sir.

"Q. Did he say anything about running it his own way or how he pleased?

"A. Yes, sir; said that he could run it his own way now."

On page 53 Mr. W. P. Devereux testified:

"Q. * * * I went down there and was beginning to look around and I told Charlie what Mr. Moreland said and he just remarked that he didn't understand Mr. Moreland, that he had bought it.

\* \* \* \*

"Q. Did you ever have any—did you ever have any stock of the National Cigar Store listed with you for sale?

"A. Well, I can tell you how it was. I don't know whether it was listed or not.

"Q. Tell us?

"A. * * * Mr. Moreland asked me to sell the stock of goods and fixtures down there. I went down there and was meaning to look around and I told Charlie what Mr. Moreland said and he just remarked that he didn't understand Mr. Moreland, that he had bought it."

. From the above testimony we are convinced that the two accounts were sold to the defendant, Charles Dickens, while he was operating the National Cigar Store; that he received the goods; that he sold the same or the greater part of them; and that he received the money for same.

We therefore think that the judgment of the District Court holding him responsible for the price is in accordance with both law and equity.

It is therefore ordered, adjudged and decreed that the judgment appealed from be affirmed at defendant's cost.