**BURTHE v. LEE et al.** *
No. 14689.

Court of Appeal of Louisiana. Orleans.
Jan. 15, 1934.

Hugh M. Wilkinson, A. Miles Coe, Fred W. Oser, and Harry Nowalsky, all of New Orleans, for appellants.

Leslie P. Beard and Chester A. Peyronnin, both of New Orleans, for appellee.

JANVIER, Judge.

This suit results from an automobile collision which occurred at 1:30 o'clock in the morning of December 5, 1932, at the corner of Freret and Milan streets.

Plaintiff, Burthe, was driving his Viking car out Milan street towards Lake Pontchartrain, and a taxicab of defendant Richard Lee was on its way down Freret street, being operated by Ivory Adams, a colored employee. As the Viking, in its progress across Freret street, reached a point almost midway of that street, it was struck on the left rear fender and wheel by the taxicab. Plaintiff sustained personal injuries, and his automobile was damaged. He seeks remuneration for the damage to his automobile and for his personal injuries, medical expenses, etc.

After the petition had been filed in the district court and the legal delays had expired, plaintiff, on motion, obtained a preliminary default, which, in due course, was confirmed; judgment being rendered in his favor in the sum prayed for, to wit, $3,223.75.

Then, for the first time, counsel for defendants awakened to the fact that they had overlooked the matter, and they, on March 30, 1933, before the judgment had been signed and prior to the day on which it might have been signed, made application for a new trial based upon three grounds:

First, that the particular attorney to whom the defense of the case had been intrusted had, just prior to the time of the entry of default, been engaged for several days in the trial of an important criminal case in an adjoining parish, and had been so intensely occupied in the trial of that case that this matter had escaped his attention.

Second, that for some time prior to the entry of the default the civil district court had been in recess due to the so-called "bank holidays" of last spring, and that the judges of the said court, sitting en banc, had entered an order to the effect that no defaults would be entered or confirmed during the term of that recess, and that, although that term had expired, counsel, due to the confusion result-

ing from the so-called "bank holidays," had overlooked this matter.

Third, that the amount awarded was not justified by the evidence adduced on confirmation of default.

The new trial was granted, and, after a hearing, judgment was again rendered in favor of plaintiff and against both defendants, but for only $2,193.75. Both defendants have appealed.

Counsel for plaintiff contends that proper ground was not shown for the granting of the new trial and that the trial judge was in error in setting aside the judgment rendered in confirmation of default and in granting the new trial.

The jurisprudence of this state has firmly established the rule that trial courts have great discretion in the matter of granting or refusing new trials.

The articles of the Code of Practice, articles 547, 557, 558, 559, and 560, indicate to our minds that the framers of the Code intended that wherever the trial judge might think it advisable, in the interest of justice, to reopen a matter, so long as the judgment had not been signed, the right to do so should exist. It is true that article 560 sets forth only three grounds on which a new trial must be granted, but that article was not intended to include all grounds on which the court might in its discretion grant a new trial, but only those three, on any one of which a new trial must be granted as a matter of right.

In Iberville Bank & Trust Co. v. Zito, 169 La. 421, 125 So. 435, 436, the Supreme Court said: "New trials are granted in the interest of justice, and are left very largely to the discretion of the trial judge. Nessans v. Colomes, 130 La. 375, 57 So. 1010. The court, in its sound discretion within the legal delays, may even grant a new trial ex proprio motu. Within such delays, the judge has control of the judgment, and, if he is satisfied that an error has been committed, he may, with or without a formal application on behalf of the party cast, set aside the judgment and order a new trial. State v. Blackman, 110 La. 266, 34 So. 438."

In Nessans v. Colomes, 130 La. 375, 57 So. 1010, 1011, we find the following:

"New trials are granted in the interest of justice, and are left very largely to the discretion of the trial judge; in other words, in the matter of the granting of them, form must yield to the substance and call of justice. They stand pretty much on the same footing as the remanding of cases by this court. The following excerpts are apposite in that connection:

" 'So far as granting the new trial was concerned, that might have been done within the legal delays by the judge ex proprio motu. He has within such delays such control of the judgment that, if satisfied of an error committed, he may, with or without a formal motion for a new trial having been filed by the party cast, direct the judgment set aside and a new trial ordered.' State ex rel. Shreveport Cotton Oil Co. v. Blackman, 110 La. 266, 34 So. 438.

" 'When the record of a suit discloses enough to satisfy the court that the whole story of the case is not told, that essential facts have not been given in evidence and important documents have been omitted, and that substantial justice cannot be done between the parties in the state of the record as filed here, the court will, in its discretion, in the interest of justice, remand the case.' Muller v. Hoth, 105 La. 246, 29 So. 709.

" 'Where it is manifest that evidence improperly excluded by the trial court, on the one hand, and withheld by the advice of counsel upon the other, is easily obtainable, and may serve to aid in the determination of an important issue, this court will in its discretion remand the case in order that such evidence may be supplied.' Nunez v. Bayhi, 52 La. Ann. 1719, 28 So. 349.

" 'Our courts have not hesitated to afford relief against judgments, irrespective of any issue of inattention or neglect, when the circumstances under which the judgment is rendered show the deprivation of the legal rights of the litigant who seeks relief, and when the enforcement of the judgment would be unconscionable and inequitable.' New Orleans v. Le Bourgeois, 50 La. Ann. 591, 23 So. 542."

The Court of Appeal for the Second Circuit, in Goode-Cage Drug Co., Inc., v. National Cigar Store et al., 1 La. App. 798, said: "An application for a new trial is addressed to the sound discretion of the lower court and when granted is rarely if ever disturbed by the Appellate Court for the reason that the trial court may, in its discretion, grant a new trial ex officio."

In Gale v. Kemper's Heirs, 10 La. 209, the Supreme Court very tersely said: "New trials are within the sound discretion of the court, and may be granted ex officio."

Lawsuits are not games in which courts are the mere referees or umpires, and in which technicalities must be allowed to triumph over actual justice. It is our duty to permit litigants all reasonable opportunity to place before us all facts bearing on the issues involved. Manifestly, the substantive rights of the defendants here would have been denied them by a refusal of the new trial, because on the second trial a much smaller award was made. At this smaller award plaintiff has neither appealed nor answered the appeal.

It is only where the discretion allowed the trial court has been abused that an appellate court should interfere with the exercise of that discretion. The only question, then, to be considered, is whether there was any

reasonable cause for the granting of the new trial.

■ It should be remembered that for a period of nearly three weeks the district court was in recess due to the closing of all of the local banks, and that during that time no default could be entered. It is not unreasonable to suppose that counsel, busy with various matters growing out of the said situation with reference to the banks, might overlook for a short period some particular piece of litigation. It would, however, be most unreasonable to require the litigant in such case to suffer, wherever the power to grant relief is in the court.

We have been cited no case and have ourselves found none in which an appellate court has reversed, as an abuse of discretion, the action of a district court in granting a new trial. We consider this significant. If, in the reported decisions of a century of litigation, there can be found not one case in which abuse of discretion in granting a new trial has been considered sufficient to require the setting aside of the order granting the new trial, we feel that, for such action to be taken, manifest and gross indeed must be the abuse resorted to. We find no reason to hold that the new trial was not properly granted.

The charges of negligence made against the driver of the taxicab are: First, that he was driving at an excessive rate of speed; second, that he failed to accord to plaintiff the right of way to which, plaintiff asserts, he was entitled; third, that he failed to sound the horn as he approached the intersection; and, fourth, that he was operating the taxicab on the left side of Freret street, instead of near the right, or river, side.

Plaintiff also charges that, even if it be shown that he himself was in any way at fault, still the driver of the taxicab could have avoided the accident by passing around the rear of his car, or by stopping the taxicab, and that thus defendants are liable because of the failure of the said taxicab driver to avail himself of the last clear chance to avoid the accident.

The Owners' Automobile Insurance Company of New Orleans is admittedly the liability insurance carrier of defendant Lee, and that corporation has been made defendant because, under the provisions of section 3 of Ordinance No. 13825, C. C. S., of the city of New Orleans, plaintiffs, in suits such as this, are given the right to proceed directly against such insurance carriers.

Defendants deny that the driver of the taxicab was negligent in any of the particulars set forth, and aver that the proximate cause of the accident was the carelessness of Burthe himself in driving into the intersection and into the path of the approaching taxicab when it was too late for the latter to be stopped, or to be swerved from its course.

We shall first consider the question of whether or not there was negligence in the chauffeur of the taxicab in any of the particulars charged.

■■ In the matter of speed, though his fault may not have been great, still there is no doubt that he was at fault, and that the taxicab approached the intersection somewhat more rapidly than is permitted by the pertinent traffic ordinance of the city of New Orleans, No. 13,702, C. C. S. In subsection 3 of article V of that ordinance, it is provided that: "It shall be prima facie lawful for the driver of a vehicle to drive the same at a speed not exceeding * * * fifteen miles an hour * * * when approaching within fifty feet of and in traversing an intersection when the operator's view is obstructed."

We said in Murphy v. Star Checker Cab, Inc., 150 So. 79, 80: "While this provision, as we have stated, does not of itself make it unlawful for an operator of a vehicle to enter such intersection at a speed in excess of fifteen miles an hour, it places the burden on such operator to show that the speed at which the intersection was entered was below fifteen miles an hour, or, if it was in excess of fifteen miles an hour, to show that it was not unsafe."

Here the view was obstructed, and that fact, coupled with the fact that the speed of the taxicab was admittedly more than fifteen miles an hour, places defendants under the necessity of showing that that speed was reasonable and proper under the circumstances. There is nothing in the record which convinces us of this. Both of the streets involved were paved thoroughfares and much traveled, and, under the circumstances, the speed of the taxicab was greater than it should have been. We therefore conclude that, in the matter of speed, defendant's employee was at fault.

■ We do not agree with plaintiff, however, that the record shows that the taxicab approached the intersection on the left, or lake, side of Freret street. Mr. Mehle, who, on the next morning, examined the tire marks on the surface of the street and who was produced by plaintiff as a witness, states that the two vehicles met at a point just a little on the lake, or left, side of the middle of the space between the two street car tracks on Freret street. This would be just to the left of the middle of the street. The evidence shows that just prior to the impact the taxicab had been swerved to its left. Therefore, since, at the time of the impact, it was almost in the center of the street, it must, prior to the swerve, have been on the right-hand side of the center.

Counsel for plaintiff, in a supplemental brief, seek to dispel "any impression which may exist in the mind of the court that the testimony of Mr. Victor Burthe * * * might in any way be deliberately false."

In reaching the conclusion to which we have come, were it necessary to find that plaintiff was guilty of deliberate falsification, it would be almost difficult, if not well-nigh impossible, for us to have arrived at that conclusion, because we are well aware of the excellent reputation which plaintiff deservedly bears in this community. Our belief is that there has been an honest mistake in his estimates of speed and distance, and that, without realizing it, he unwittingly failed to look as he entered the intersection.

Nor do we believe that the evidence shows that the horn of the taxicab was not sounded. The evidence on this point is conflicting, and we are unable to say that it preponderates either way.

Under the ordinance referred to, plaintiff was entitled to the right of way, since his automobile approached the intersection from the right-hand side of the other. Prior to the enactment of Ordinance No. 13702 vehicles on streets having on them street car tracks were accorded the right of way over vehicles on intersecting streets, but, from the new ordinance, that provision was omitted, and, except on certain designated streets, the right of way is now given to vehicles approaching from the right. In the present ordinance the pertinent provision, which is contained in paragraph "a" of section 10 of article VI, reads as follows: "On all streets, except through streets and boulevards, and at intersections of right-of-way streets with one another, all vehicles approaching intersecting streets from the left shall give right-of-way to vehicles approaching from the right."

But the fact that Mr. Burthe was entitled to the right of way and that the other vehicle was approaching at an excessive speed does not necessarily entitle him to recover because, even where one party to such an accident is at fault, there can be no recovery if the other party, had he exercised reasonable care and prudence, could have avoided the accident. While it is true that in his petition Mr. Burthe alleged that when he entered the intersection the other car was "not less than 250 feet" away, and though it is also true that, had the other car been that far away, it would not have been negligence on Mr. Burthe's part to have proceeded, the true fact seems to be that he actually entered the intersection without looking into the direction from which the taxicab was approaching, and that he drove directly into its path when it was so near that it could no longer be stopped in time to avoid striking his car.

Though he had, in his petition, stated that the other car was 250 feet away when he entered the intersection, in his testimony given on the new trial he considerably shortened this distance and admitted that he did not see the other car at all until he was about one-quarter of the distance across Freret street, and that at that time the other car was only 35 or 40 feet away. His statement is: " * * * I positively didn't see any car coming. I looked both ways and didn't see any car coming until I was a quarter into Freret Street, and then the car was, as I say, 35 or 40 feet from me as near as I can judge distance."

Later in his testimony he was willing to concede that the other car may have been only 30 feet away when he looked up and saw it approaching. We cannot overlook the fact that when he first took the stand in confirmation of default he had stated that, when he looked up, he saw the car, and that it was then "around 25 yards from me."

These various estimates given by him indicate plainly that Mr. Burthe was not at all certain of the exact distance between his car and the taxicab when he entered the intersection, but lead to the inevitable conclusion that he did not look before he entered the danger zone, and that, when he did look, the taxicab was very near to him.

It is, of course, elementary that not to see is tantamount to not to look, and that, since the other car was actually on the street, with its lights burning, if he failed to see it, his failure resulted from the fact that he failed to look. In Gibbons v. N. O. Terminal Co., 1 La. App. 371, this court, according to a syllabus written by the court, held that: "The presumption of law, juris et de jure, is that a plaintiff saw a thing that he should have seen had he looked, and that he failed to look at the proper time and in the proper manner if he did not see the things he should have seen by looking."

The Supreme Court (Gibbens v. N. O. Terminal Co., 159 La. 347, 105 So. 367) granted a writ of certiorari, and, after considering the matter, affirmed the decree of this court.

That the lights of the taxicab were burning is conceded, for plaintiff himself said that, when he looked up and saw the taxicab, "his lights were bearing down on me."

Nor are we satisfied that plaintiff was not himself at fault in the matter of speed. Since he was approaching and intended to cross a street on which there were located street railway tracks, and since his view up that street, before he reached the intersection, was obstructed by shrubbery, his speed should have been regulated in accordance with subparagraph "b" of section 3 of article V of the ordinance (No. 13702, O. C. S.) which said subsection, since it in part provides that it shall be prima facie lawful to operate a car at a speed "of fifteen miles per hour when approaching within 50 feet of a grade crossing of any steam or electric or street railway when the driver's view is obstructed," inferentially makes it negligence to approach such a crossing at a speed greater than fifteen miles per hour.

Since his view was obstructed at the corner in question, if the speed of his car was in ex-

cess of fifteen miles an hour, the ordinance placed on him the burden of showing that the speed, though in excess of fifteen miles, was nevertheless reasonable. Mr. Burthe admitted that for some time before reaching Freret street his car had been traveling at about twenty-five miles an hour. Although he stated that he had slowed down to "not more than ten or twelve miles going across," we think that the fact that his car turned over afterwards, and that, when he entered the intersection, he did not see any vehicle approaching, indicates that in all probability his speed was greater than it should have been. At any rate, the conclusion forces itself upon us that, had he looked, he would have seen the taxicab, and that he would have realized that it was too close to permit of his crossing ahead of it.

It is true that, even though he may have been at fault, still there could be recovery if he could show that, after his negligence had spent its effect, there was yet time for the taxicab driver, by the exercise of reasonable prudence, to avoid the accident.

But plaintiff has not shown this, as we are convinced that, when his car emerged into Freret street and entered the path of the approaching taxicab, the latter was so near to the former that an accident was no longer avoidable. We said, in Downey v. Dittmer, 151 So. 653, 655, decided January 2, 1934 and not yet reported [in State Reports]: "While it is possibly true that an automobile traveling at the rate at which the Pontiac was being driven could be stopped within 30 feet if the driver had been previously warned that he would be required to make such a stop, we believe that such is not always the proper way to determine whether any particular stop should or should not have been made. No one can be required to act in an unexpected emergency with the same promptness and precision which he should evidence if apprised in advance that he is to be subjected to a test."

In Murphy v. Star Checker Cab, Inc., supra, appears the following: "That one has a statutory right of way does not justify blindly and recklessly dashing into the path of oncoming disaster."

See, also, Johnson v. Item Co., Ltd., 10 La. App. 671, 121 So. 369; Pugh v. Henritzy et al., 151 So. 668, decided December 11, 1933, and not yet reported [in State Reports].

We notice in our decision in the Murphy Case a quotation from a court of another jurisdiction which impresses itself upon us and which we now repeat: "While the law accords the right of way, it requires, as well, the exercise of at least 'horse sense.' The statute does not authorize one, in approaching a highway crossing, to assume that in all events he may proceed without looking, or, if unable to see, without exercising precau-

tion commensurate with reasonable prudence." Kerns v. Lewis, 246 Mich. 423, 224 N. W. 647.

The accident with which we are now concerned would not have occurred had Mr. Burthe himself exercised reasonable care.

The judgment appealed from is annulled, avoided, and reversed, and plaintiff's suit is dismissed, at his cost.

Reversed.